

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

---

No. 06-14-00041-CR

---

JAMEY JUSTIN SMITH, Appellant

V.

THE STATE OF TEXAS, Appellee

---

On Appeal from the 196th District Court
Hunt County, Texas
Trial Court No. 28,911

---

Before Morriss, C.J., Moseley and Burgess, JJ.
Memorandum Opinion by Justice Burgess

# MEMORANDUM OPINION

Jamey Justin Smith pled guilty to aggravated sexual assault,[1] and a jury trial was held on punishment. He was sentenced to life in prison. After considering the record and the briefs and oral arguments of the parties, we affirm the trial court's judgment and sentence, finding (1) that the trial court's rulings on the State's *Batson*[2] challenges to six of Smith's peremptory strikes were not clearly erroneous and (2) that Smith has failed to prove ineffective assistance of counsel.

## I.    Factual Background

### A.    The Sexual Assault and Robbery

On January 18, 2013, Smith entered an antique store in Quinlan, Texas, and sexually assaulted and robbed the owner, Samantha Higgins.[3] At trial, Higgins described the sexual assault and robbery in detail. Higgins testified that Smith put her in a neck hold and held a gun to her head, secured her hands behind her back with plastic zip ties, forced her to perform oral sex on him, and when she turned her head away, spit in her face and hit her in the side of her face. She also testified that Smith forced her onto the concrete floor and anally raped her and that during the course of the assault, Smith hit her in the face again, placed his finger down her throat in an attempt to cut off her windpipe, and attempted to strangle her. Having completed the sexual assault, Smith

---

[1]*See* TEX. PENAL CODE ANN. § 22.021 (West Supp. 2014). In the same trial, Smith pled guilty to aggravated robbery. *See* TEX. PENAL CODE ANN. § 29.03 (West 2011). He was sentenced to thirty years' incarceration for that offense; Smith's appeal of that sentence is addressed in our opinion in cause number 06-14-00042-CR, issued on even date herewith.

[2]*Batson v. Kentucky*, 476 U.S. 79 (1986), discussed *infra*.

[3]We use the victim's pseudonym used in the indictment and at trial. *See* TEX. CODE CRIM. PROC. ANN. art. 57.02 (West Supp. 2014).

then proceeded to rob the store, leaving Higgins restrained and lying on the floor. Smith asked about the presence of security cameras and threatened to shoot Higgins if she tried to "do anything" to alert the police. Smith then took the money from the cash register and from Higgins' purse.

While Smith was counting the money, Higgins attempted to edge towards the door and leave, but she realized she could not because her hands were restrained. Smith noticed her movements and took her to a different part of the store with his gun in her back. Higgins engaged in conversation with Smith, but when she turned to talk to him, he told her not to look at him. She testified that she did everything she could to plead with him, telling him that she would not tell anyone and that she would do whatever she could to help him, if he would just let her go. She also told him that she expected a friend to arrive at any time and that she had six grandchildren with a seventh on the way. Smith then heard a car door slam, "and it spooked him." He saw a police car across the street at City Hall, and Higgins told Smith that the police officer was inside doing paperwork and that Smith had a chance to get away while the officer was in his office.

Smith then cut the restraints from Higgins' hands and apologized for cutting her. He put his arm around her and patted her; Higgins believed the pat was a gesture intended to thank her for letting him go and not reporting him. When her telephone rang, Smith took it out of her purse. Higgins told him it was probably her daughter because she always called at that time of day. Smith returned the telephone to Higgins and told her not to turn it on before she saw his vehicle pass in front of the store. Smith then left. Higgins locked the door and collapsed to the floor, crying hysterically. She realized she needed help, so she called her husband, who was out of town on business. A customer came in and called 9-1-1 for her. Her father then arrived to help her, and as

3

he was helping her into his truck, she saw Smith drive by. Higgins feared Smith was returning because he had threatened her that if she told anyone what had happened, he had a friend two blocks away that he would send to "do [her] in."

Higgins testified about the traumatic effects the assault and robbery had on her. She testified that it had devastated her, that she nearly lost her business over it, and that she was not the same person she was before the assault. She also testified that during the assault and robbery, she feared that Smith would either kill her, kidnap her, or both, and that the rape and robbery had left her very frightened of people in her store, especially men. As of the time of trial, she had not been able to talk about or work through the crime with her husband, and their relationship was strained.

**B.     The Investigation**

Linda Bell conducted a sexual assault nursing examination (SANE) on Higgins. She found Higgins afraid and shaking, exhibiting "classic signs of fear." According to Bell, Higgins' face was red and bruised, and "she had a painful walk." Bell noted bruising on Higgins' face and neck, ligature marks on her wrists, scratches on her buttocks, "a lot of anal tearing, [and] excoriations[4] to the inner labial folds" and buttocks area. Bell testified that Higgins "was really shook up during the whole exam." The anal tearing led Bell to believe that "there was some blunt force trauma in that area" and that this could have been caused by an incident of forced anal sex. Higgins' neck and face injuries were indicative of strangulation and being hit in the head. Bell also testified that

---

An excoriation is "a scratch or abrasion of the skin." DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 653 (30th ed. 2003).

4

Higgins reported forced oral sex.  Finally, Bell testified that DNA material was found in Higgins' underwear.

Roger Seals, Chief of the Criminal Investigations Unit for the Hunt County Sheriff's Department, assisted Quinlan Police Officer Rob Manor in the investigation.  Seals, Manor, and Hunt County Sheriff's Department Lieutenant Tommy Grandfield met with Higgins on the day of the assault after she had completed the SANE examination.  Higgins described Smith, the vehicle he was driving, and the clothing he was wearing.  Based upon her description, Smith was arrested later that day wearing the same clothes described by Higgins.  After Smith was in custody, the officers prepared a photographic lineup, and Higgins identified Smith as her attacker from that lineup.

Seals and Manor interviewed Smith that afternoon.  According to Seals, Smith denied any involvement in the crimes and tried to place the blame on his friend Blake Smith.  Seals described Smith's demeanor during the interview as "a little cocky," but calm, rather dispassionate, and perhaps argumentative.  Smith maintained that he had nothing to do with the sexual assault and robbery.  Smith claimed that he had just dropped his girlfriend off at high school that morning where he met up with Blake and that the two of them had spent the morning smoking K2, or as he described it, "legal weed."  Smith told Seals and Manor that he had smoked K2 for a long time and always remembered everything, so he could not have committed the offenses in a drug stupor.  He claimed that Blake had borrowed his truck that morning and that Blake looked somewhat like him.  At one point, Smith said he was angry to be incarcerated while Blake was not because Blake was the guilty party.  Smith consistently maintained his innocence.  Near the end of the interview,

5

Smith asked the officers if they would apologize to him when he was found "unguilty." He then stated that he would laugh in the officers' faces when he was ultimately vindicated.

Smith's biological father, Joe DeAngelo,[5] testified that he was contacted about Smith's arrest that day. DeAngelo testified that Smith denied any involvement in the assault and robbery and that he and Smith's mother, Denise DeAngelo, believed him. DeAngelo testified that they were concerned about the length of time it would take for the state crime laboratory to analyze the DNA samples from the attack. The DeAngelos agreed to pay the $1,500.00 fee for DNA testing at a different laboratory because the testing would be completed quicker and they believed the results would exonerate Smith. Instead, the DNA testing established that Smith was the source of the DNA materials recovered during the SANE examination of Higgins.

## C.    The Trial

Smith entered pleas of guilty to the offenses of aggravated sexual assault and aggravated robbery and went to trial before a jury on the issue of punishment. Smith testified and confessed his guilt, claiming that he was so intoxicated on K2, marihuana, heroin, and formaldehyde that he did not remember anything about the offenses despite having told the investigating officers that he always remembered everything after smoking K2 and that he could not have committed the offenses in a drug stupor.[6] Smith also testified that he did not know he was guilty until the DNA

---

[5]Joe and Denise DeAngelo were not married when Smith was born, so Smith bears his mother's former last name. They married when Smith was eleven years old and lived together as a family with Smith's half-brother, who is Denise's son from a previous marriage.

[6]In his interview with the officers, Smith mentioned no other drug consumption. When asked by officers if he could have lost his memory of events because of the drug and committed the rape and robbery under the drug's effects, Smith responded in the negative and indicated that he smoked K2 frequently and always remembered everything that happened. Yet, in his psychological interview and at trial Smith said that he and Blake had also consumed heroin and

6

test results were known. After receiving the DNA test results, and about two weeks before trial, Smith claimed for the first time that his older half-brother had sodomized him and forced him to perform oral sex when he was nine or ten.

On cross-examination, however, Smith admitted that when his parents confronted him with the DNA test results and asked him why he did not tell them he was guilty, he did not profess surprise at the results, but instead told them he denied guilt because he did not think they would stand by him otherwise. Moreover, Smith admitted that he committed each of the acts described by Higgins as the State listed them during cross-examination. In addition, the State asked Smith, "So even at the time you're raping her, you're setting up Blake; is that right?" Smith answered, "Yeah." Smith also admitted that he had never spoken to anyone about the prior sexual abuse he alleged against his half-brother until after the DNA test results were known.

The State also questioned Smith about his prior criminal record, including a juvenile adjudication for burglary of a building. Smith admitted that he and other boys broke into a school, caused $1,200.00 in damage, and stole a computer. Smith further admitted that he had initially denied all involvement in the burglary and, instead, directed investigators to another boy, but that Smith had finally admitted his guilt in the burglary and was placed on community supervision. Smith acknowledged that the circumstances of the juvenile offense were similar to the present cases in that he had been "caught redhanded; and all of the sudden . . . blam[ed] a friend . . . [before] finally admit[ing]" his guilt.

marihuana soaked in formaldehyde. Smith's father said Smith never mentioned having taken any drugs other than K2 until after the DNA results in this case identified Smith as the source of the DNA material found on Higgins. The State pointed out these inconsistencies in cross-examining Smith.

Smith also agreed that a person who committed these kinds of offenses, with these circumstances, deserved a life sentence. The following exchange occurred on cross-examination:

> [The State]: Mr. Smith, if somebody had done this to your mama, what do you think a jury should give them?
>
> [Smith]: Prison time.
>
> [The State]: Do you think they should get a life sentence if they put your mama through what Samantha went through?
>
> [Smith]: Yes.
>
> [The State]: And you understand that's what you deserve in this case?
>
> [Smith]: Yes.

Finally, Smith agreed with the State that "no one can ever risk letting you be free again."

## II. Issues Presented

Smith raises two issues on appeal. First, he alleges that the trial court erred in granting the State's *Batson*[7] objections to six of his peremptory strikes on the basis of gender. Second, he alleges that his trial attorney failed to provide him with effective assistance of counsel because he failed to review the jury panel's questionnaires after the completion of voir dire and prior to the *Batson* hearing. Smith asserts that had his trial attorney reviewed the questionnaires, he would have determined that veniremember 35, who ended up serving on the jury, stated that her sister had been a rape victim. He further asserts that his peremptory challenge to veniremember 35 would have been sustained on that basis.

---

[7]*Batson v. Kentucky*, 476 U.S. 79 (1986).

**III.    Smith's Points of Error Regarding the State's *Batson* Challenges**

**A.    The Law Governing *Batson* Challenges**

**1.    Introduction**

Although Texas law allows parties to peremptorily strike a certain number of venirepersons following voir dire,[8] it does not allow parties to exercise such strikes in a manner that violates the Equal Protection Clause of the U.S. Constitution, i.e, by striking venirepersons because of their race or gender. *See Batson*, 476 U.S. at 89; *see also* U.S. CONST. amend. XVI, § 1; *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 130–31 (1994) (extending *Batson*'s reasoning to prohibit peremptory strikes based on gender of venireperson). "The requirements of *Batson* apply equally to defendants, and the prosecution is equally permitted to challenge a defendant's unconstitutional exercise of peremptory challenges." *Yarborough v. State*, 947 S.W.2d 892, 894–95 (Tex. Crim. App. 1997) (citing *Georgia v. McCollum*, 505 U.S. 42 (1992)).[9] The same considerations and tests used to evaluate race-based challenges to the exercise of peremptory strikes are used in considering gender-based challenges. *See J.E.B.*, 511 U.S. at 144.

As with race-based *Batson* claims, "a party alleging gender discrimination must make a prima facie showing of intentional discrimination before the party exercising the challenge is required to explain the basis for the strike." *Id.* at 144–45 (citing *Batson*, 476 U.S. at 97). "When

---

[8]*See* TEX. CODE CRIM. PROC. ANN. art. 35.15(b) (West 2006).

[9]Additionally, while *Batson*'s Equal Protection rule was implemented for the protection of defendants, it also protects the rights of the citizenry at large to participate in the jury system. African-Americans, or in this case, women, may not be denied "'the same right and opportunity to participate in the administration of justice enjoyed by the white population.'" *Batson*, 476 U.S. at 91 (quoting *Swain v. Alabama*, 380 U.S. 202, 224 (1965)).

an explanation is required, it need not rise to the level of a 'for cause' challenge; rather, it merely must be based on a juror characteristic other than gender, and the proffered explanation may not be pretextual." *Id.* at 145.[10]

A *Batson* challenge proceeds in three stages. In the first stage, the party making a *Batson* challenge must make a *prima facie* showing of discrimination. In the second stage, the burden shifts to the party making the peremptory strike to posit a gender-neutral reason for the strike. In the third stage, the trial court determines whether the party raising the *Batson* challenge has proved purposeful discrimination. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012) (citing *Batson*, 476 U.S. at 96–98). Once the striking party offers the neutral reason(s) for the strike "and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the [*Batson* challenger] has made a prima facie showing becomes moot." *Hernandez v. New York*, 500 U.S. 352, 359 (1991).[11] A neutral explanation need not be "a reason that makes sense" at the second stage, but simply a reason that does not deny equal protection; a race-neutral explanation that is "silly or superstitious" satisfies the second stage of *Batson*, even though a trial judge "may choose to disbelieve a silly or superstitious reason" at the third stage. *Purkett v. Elem*, 514 U.S. 765, 768–69 (1995).

---

[10]Although strictly speaking, the case at bar involves strikes which could be referred to as *J.E.B.* challenges, because most cases we reviewed and the parties cited address challenges involving race and because the parties argued this case using the term *Batson* challenges, we will refer to the challenges and strikes as *Batson* challenges.

[11]Although the State characterized its *Batson* challenge as an allegation that Smith improperly struck female veniremembers over the age of forty, we only review the gender-based aspects of the challenge, as age is a neutral basis for a peremptory strike. *See Lee v. State*, 949 S.W.2d 848, 851 (Tex. App.—Austin 1997, pet. ref'd); *Barnes v. State*, 855 S.W.2d 173, 174 (Tex. App.—Houston [14th Dist.] 1993, pet. ref'd).

## 2. Standard of Review

The Court of Criminal Appeals has held that

> [a] reviewing court should not overturn the trial court's resolution of the *Batson* issue unless it determines that the trial court's ruling was clearly erroneous. In assaying the record for clear error, the reviewing court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so long as those arguments or considerations are manifestly grounded in the appellate record. But a reviewing court should examine a trial court's conclusion that a racially neutral explanation is genuine, not a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous.

*Blackman v. State*, 414 S.W.3d 757, 765 (Tex. Crim. App. 2013) (footnotes omitted) (citations omitted). "The term 'pretext' is solely a question of fact; there is no issue of law. Therefore, the trial court was in the best position to make that credibility determination." *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004).[12]

When the Court of Criminal Appeals adopted the clearly erroneous standard in *Whitsey v. State*, 796 S.W.2d 707, 721–22, 726 (Tex. Crim. App. 1989) (op. on reh'g), it quoted extensively from *Anderson v. Bessemer City*, 470 U.S. 564 (1988). We find the most guidance for applying this standard in the following excerpt from *Whitsey*:

> If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous.

---

[12]In *Gibson*, the Court of Criminal Appeals found that the intermediate court "misapplied this 'clearly erroneous' standard of appellate review when it substituted its judgment for the trial court's in deciding that the prosecutor's facially race-neutral explanation for striking veniremember 11 was a pretext." *Gibson*, 144 S.W.3d at 534.

*Whitsey*, 796 S.W.2d at 722 (quoting *Anderson*, 470 U.S. at 573–74). *Whitsey* also stated that "'**[a]**

**finding is "clearly erroneous" when although there is evidence to support it, the reviewing**

**court on the entire evidence is left with the definite and firm conviction that a mistake has**

**been committed.**'" *Id.* at 721 (alteration in original) (quoting *Anderson*, 470 U.S. at 573–74

(quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948))). While either

definition of the standard is instructive, we find that the first, precluding appellate reversal if the

trial court's conclusion is plausible upon reviewing the whole record, better designates the

boundary between deference to the trial court's determinations and the exercise of appellate review

of the trial court's ruling.[13] Accordingly, we will not reverse the trial court's *Batson* rulings if they

are plausible in light of the entirety of the record.

**B.     Application**

**1.      The State's *Batson* Challenge**

The State articulated its *Batson* challenge as follows:

> Your Honor, in this circumstance, we had two men and eight women struck. For the eight women that were struck, it was noted by the State that it was a disproportionate number of women over the age of 40 who were struck by the Defense.

> We noticed this immediately based on the fact that we had a prior mistrial in this case and we had already had another jury selected. And when that panel came up, I noticed there was no women on it but two.

> So I wanted to purposely make sure on this jury that we did not have that happen again and have all the women struck. That's why we're making the *Batson*

---

[13]In *Manzi v. State*, 88 S.W.3d 240, 243 (Tex. Crim. App. 2002), the Court of Criminal Appeals invoked the "plausible" review language in *Anderson* and did not reference the "firm conviction that a mistake has been committed" language.

12

challenge, Your Honor. We feel like there was a disproportionate number of women over the age of 40 in this case without just reasons.

The State challenged Smith's peremptory strikes of veniremembers 5, 8, 11, 15, 27, 35, 41, and 48. The trial court then took "judicial notice that last week [the court] when [it] had the first attempted jury service, there [were] ten men and two women on the jury after it was sworn." The State cited the veniremember cards from that morning's voir dire[14] and summed up their challenge: "And if you look through the starting number of jurors and you go down the line, almost every female over the age of 40, with the exception of one or two, [was] struck by the Defense."

The trial court found "deliberate and intentional discrimination" in the exercise of six of Smith's eight peremptory strikes used against female veniremembers. The court disallowed those strikes, and four of those women were placed on the jury. Accordingly, we are asked to review the trial court's ruling on the State's *Batson* challenges to veniremembers 5, 8, 15, 35, 41, and 48.

### 2. Smith's Gender-Neutral Reasons and the State's Rebuttals

Below we identify the subject veniremember, set out the gender-neutral explanation offered as to the veniremember, and then recount the State's rebuttal. We do this for each of the four veniremembers who served on the jury.

#### a. Veniremember 5

The State first objected to Smith's peremptory strike of veniremember 5. Smith replied, "She was in the health and rehab occupation, prior employment, and I think her responses to some

---

[14]Prior to voir dire, each veniremember completed a small, postcard-sized information card which was included with each person's summons to jury duty; we refer to these as information cards. These should not be confused with veniremember questionnaires, which are letter-sized sheets requesting similar information, though in greater detail. We refer to these latter documents as questionnaires. The difference in these two informational documents will be discussed in our resolution of Smith's final point of error claiming ineffective assistance of counsel.

of [our] questions with eye contact and so forth and the shaking of her head." In rebuttal, the State asserted,

> Your Honor, Juror No. 5 is a 52-year-old female. The Defense attorney said that he struck her because she had previously worked in Greenville Health & Rehab.
>
> One of the possible defenses or reasons they might use in a punishment trial to ask for mitigation or a lesser sentence would be the basis of mental stability or mental action, including drug use.
>
> Certainly, her work as a rehabilitation specialist would not hinder the Defense in that area, and we feel like that is a -- not a valid reason for using a peremptory strike. . . . She currently works at Walmart.

Smith then replied, "[T]here's a SANE nurse testifying. She -- and that's the reason [we] struck her." The trial court sustained the State's *Batson* challenge to Smith's peremptory strike of veniremember 5. Smith did not mention the veniremember's demeanor again, and the trial court made no comment on that earlier-posed reason.

On appeal, the State points out that Smith did not similarly strike all people in the health care field as support for its argument that Smith's explanation for striking veniremember 5 was pretextual. The State emphasized that veniremembers 49, 56, and 58 were in the strike zone, but were not struck. Veniremember 49's information card states that she works at "TX Digestive Disease CTR" and has an associate's degree in nursing. Veniremember 56's information card states that she currently works for Commerce Independent School District, that she had previously worked for Memorial Hospital, and that she has a bachelor's degree in biology with a minor in chemistry and a master's degree in school counseling. Veniremember 58's information card states that she works at Parallon Staffing and that she previously worked for THR Arlington. Although

14

all three jurors were in the strike zone, Smith used his last peremptory strike on veniremember 52, a male police officer, rather than veniremember 49, a female nurse.

The State also asserts that Smith did not strike veniremember 27, a health care worker, yet that is not correct. Smith's strike list reflects that he peremptorily struck veniremember 27. At the *Batson* hearing, Smith explained that he struck veniremember 27 because her brother "is a patrol officer and a detective." According to her information card, veniremember 27 worked in a dental office. During voir dire, she stated that she knew the SANE who would be testifying: Veniremember 27 stated, [The SANE] comes into our office quite frequently." Smith's peremptory challenge to veniremember 27 was allowed over the State's *Batson* objection.

The fact that Smith did not strike veniremember 49, a nurse who was in the strike range, undermines his position that he struck veniremember 5 because she was in the health care field. On the other hand, the fact that Smith struck another health-care worker, veniremember 27, and that veniremembers 5 and 27 were much more likely to make it to the petit jury than veniremember 49 supports his explanation for striking veniremember 5. Nevertheless, we must defer to the court's determination of the credibility and genuineness of Smith's explanation. "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." *Hernandez*, 500 U.S. at 365. This is a matter squarely within the discretion of the trial court. *See id*. On this record, we cannot say that the trial court's account of

15

the evidence, deferring to the court's determination of credibility, is not plausible. We overrule

Smith's point of error concerning veniremember 5.

### b. Veniremember 8

The State next objected to Smith's peremptory strike of veniremember 8. Smith stated that

he struck veniremember 8 because she had a cousin with the Greenville Police Department and

because she worked in the health care field. Specifically, Smith stated, "[S]he's in the health field

with dialysis. She's an RN. And there's a SANE nurse testifying." The State responded,

> Your Honor, Juror No. 8 is a 37-year-old female. The Defense made an objection
> to her because she works as a dialysis nurse. This case has nothing to do with
> dialysis. It has nothing to do with end-of-life measures. There will be no testimony
> regarding anything involving that information.
>
> And we feel like that was an invalid reason for using a peremptory strike,
> that it's -- or that it's based on the presumption that she is a female and has nothing
> to do with the fact of her job.

Smith also stated that the veniremember's cousin worked for the Greenville Police Department for

more than fifteen years, and the State countered by stating that the Greenville Police Department

was not involved in the present case.

On appeal, the State points out eight other veniremembers with relatives in law

enforcement who were not struck by Smith, and three of these were women. The two strikes

allowed by the trial court were veniremembers who had a brother and one who had a father in law

enforcement; of the eight similarly situated veniremembers not struck, none had family members

employed in law enforcement who were in such close degree of consanguinity as those of the

allowed strikes.[15]  The trial court's ruling on veniremember 8 is plausible in light of the record.

Accordingly, we overrule Smith's point of error as to veniremember 8.

### c.     Veniremember 15

The State next objected to Smith's peremptory strike of veniremember 15.  Smith

responded,

> That one I was a little bit confused.  Ms. Denney, I believe, is the dog lady, whose reputation is sheltering dogs and so forth.
>
> I've donated money to her but I don't -- I think -- I know how she feels about animals, so she would hang anybody that abused an animal, so I don't think she would be very good on a jury.

The State offered the following rebuttal:

> Your Honor, Juror No. 15 is a 69-year-old female.  The reasoning, I believe, the Defense gave for striking her is that she had simply served as a prior juror in another case.
>
> There has been -- there is at least one person who served as a prior civil juror and is still remaining on this jury with the left panel that we have now, and so we feel like that is a reason that's -- an attempt to justify getting rid of her simply because she is a female over the age of 40.

Smith acknowledged that the case to be tried had nothing to do with animals, but was concerned

about seating a juror who was so concerned with animal welfare,[16] and added, "it might not be the

same Denney.  I don't know.  But I think it is."  However, when the trial court asked if Smith

---

[15]The State's brief also claims that veniremember 46 had a brother who was a police officer, but our reading of that veniremember's information card shows no relatives in law enforcement.

[16]Though we can only speculate, apparently, Smith's counsel was concerned that if a juror was that concerned with animal welfare, she would be especially sympathetic to a woman who had suffered the injuries suffered by Higgins.

wanted to call the veniremember back to the courtroom for further inquiry, Smith declined, "I don't -- not really, no."

Striking a veniremember for a reason not related to the facts of the case can suggest an impermissible pretextual reason. *Whitsey*, 796 S.W.2d at 713. Further, the fact that Smith declined the opportunity to bring the veniremember back in the court room for clarification could well have undermined his credibility in the eyes of the trial court. Accordingly, there is a plausible basis for the trial court's disallowing this peremptory strike, and we overrule Smith's point of error as to veniremember 15.

### d. Veniremember 35

The State next objected to Smith's peremptory strike of veniremember 35. Smith said he struck this woman because she lives in Quinlan, where the charged offenses occurred, because she previously served on a criminal jury that reached a verdict, and because Smith thought that the prosecutor knew the veniremember. The prosecutor stated that she did not know veniremember 35 and that veniremember 35 did not respond when the panel was asked if anyone knew her.[17] The State then further rebutted Smith's alleged neutral reason.

> Your Honor, this is a 66-year-old female. The Defense said that they struck her because she had been a prior juror, I think. And for that -- only for that reason.
>
> She answered every question asked by both parties. She did not indicate she could not be fair and impartial and, in fact, didn't answer any questions that would have shown a reason for cause to excuse her in this case.

---

[17]In its voir dire questioning, the State asked if anyone on the panel knew the prosecutor, defense counsel, any witnesses, or the defendant.

18

Smith re-asserted that he had two reasons for using a peremptory strike on this venireperson: "[S]he had served on prior criminal panels, but also she has the same ZIP code and address in Quinlan where this alleged -- where this -- where this did happen." The State answered by saying the woman "didn't indicate any knowledge of this case."

In its appellate brief, the State directs us to two other veniremembers who lived in Quinlan or a nearby community—veniremember 19 listed a Quinlan address on her juror information card and veniremember 55 lived in West Tawakoni, a city near Quinlan. In addition, the State points out that veniremember 6 indicated that he had previously served on a civil jury, but that he was not struck by Smith. In addition, veniremember 50, a male, had served on both civil and criminal juries, and he was not struck by Smith. Furthermore, although Smith struck veniremembers 15 and 41, he did not assert their prior jury service as a basis for striking them.[18] Accordingly, the record demonstrates that the trial court had a plausible basis for sustaining the State's objection to Smith's peremptory strike of veniremember 35. Therefore, we overrule Smith's point of error as to veniremember 35.

### 3. The Trial Court's Ruling

Following Smith's proffer of neutral reasons and the State's rebuttal, the trial court made the following ruling: "The Court does find that there was a series of deliberate and intentional discrimination based on these prospective jurors being female." The court denied Smith's strikes

---

[18]The State's brief also points to four veniremembers from the January 27 mistrial and notes that Smith did not strike them, though they lived in Quinlan. While the juror information cards from that earlier mistrial are in the current record, they were not introduced until the post-trial hearing, and there is no indication that the trial court had them or considered them at the *Batson* hearing. Consequently, we will not consider those cards in this analysis.

of veniremembers 5, 8, 15, 35, 41, and 48, allowing his strikes of veniremembers 11 and 27. Veniremembers 5, 8, 15, and 35 were seated on the jury.

Considering the totality of the record and in light of our analysis above, we cannot say that the trial court's rulings were clearly erroneous. "Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. This is so even when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Manzi*, 88 S.W.3d at 243 (quoting *Anderson*, 470 U.S. at 573–74). Based on the record before us, we cannot say the trial court's decisions were clearly erroneous. We overrule Smith's first six points of error.[19]

## IV.    Smith's Ineffective Assistance of Counsel Point of Error

In his final point of error, Smith claims he received ineffective assistance of counsel. Smith's claim is based on trial counsel's failure to review the jury questionnaires before exercising peremptory strikes following voir dire of the venire panel. We conclude that Smith has failed to demonstrate prejudice resulting from counsel's representation.

### A.    Factual Background

As mentioned earlier, prior to voir dire, members of the venire panel completed short, postcard-sized information cards, which were included with each members' summons to jury

---

[19]We specifically overruled Smith's points of error as to veniremembers 5, 8, 15, and 35 as set forth above. Smith also raised points of error as to veniremembers 41 and 48. We overrule Smith's points of error as to veniremembers 41 and 48 as well, but for a different reason. Even if Smith were to prevail on his arguments as to those veniremembers, he cannot demonstrate harm because neither veniremember was seated on the jury. Accordingly, we overrule Smith's points of error as to veniremembers 41 and 48 and do not address the specifics of his arguments as to those veniremembers. *See Rousseau v. State*, 855 S.W.2d 666, 680 (Tex. Crim. App. 1993) (holding that even if *Batson* ruling is incorrect, no harm can be demonstrated where veniremember at issue was not seated on jury).

20

service.[20]  As noted previously, we will distinguish between these venireperson cards, i.e., the postcard-sized information cards, and the letter-sized, single page documents to which the prosecutor referred.  Fred Shelton, Smith's retained trial counsel, stated at a post-trial hearing that he was unaware of the questionnaires until the *Batson* hearing.

At issue in Smith's ineffective assistance allegation is the fact that veniremember 35 (discussed in an earlier point of error) wrote on her questionnaire that her sister had been "raped." The questionnaire had horizontal boxes asking whether the veniremember had been the victim of a crime or whether the veniremember, the spouse, a relative, or a close friend had ever been arrested or charged with a crime.  Diagonally, across those boxes, veniremember 35 wrote, "[M]y sister was raped."  Smith argues that had his trial counsel seen the comment on that questionnaire, his peremptory strike of veniremember 35 would likely have been sustained and she would not have served on the jury.  Smith points to the assessed sentences of thirty years for aggravated robbery versus a life sentence for aggravated sexual assault as an indication that veniremember 35's service on the jury led to a much harsher sentence for the latter offense.

**B.      Standard of Review**

To prevail on a claim of ineffective assistance of counsel, a defendant must show counsel's performance was deficient and that the defendant was prejudiced thereby.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App.

---

[20]The State said, "[Y]ou guys have questionnaires in front of you . . . . At the end of us talking, myself and [defense counsel], we will collect those questionnaires and we have to review them before we pick a jury. . . . [A]ll the way through this jury selection with myself or [defense counsel] if you get through it, and during the process, you decide you can't be fair and impartial or you can't do this case for whatever reason or you need to talk to the judge, write it in big writing on that questionnaire and we'll see it . . . ."

21

1999). Ineffective assistance of counsel claims must be firmly rooted in the record, with the record itself affirmatively demonstrating the alleged ineffectiveness. *Lopez v. State*, 343 S.W.3d 137, 142–43 (Tex. Crim. App. 2011). Failure to satisfy either prong of the *Strickland* test is fatal. *Ex parte Martinez*, 195 S.W.3d 713, 730 n.14 (Tex. Crim. App. 2006). Thus, we need not examine both *Strickland* prongs if one cannot be met. *Strickland*, 466 U.S. at 697.

We indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance and that it was motivated by sound trial strategy. *See Jackson v. State*, 877 S.W.2d 768, 771 (Tex. Crim. App. 1994). "If counsel's reasons for his conduct do not appear in the record and there is at least the possibility that the conduct could have been legitimate trial strategy, we will defer to counsel's decisions and deny relief on an ineffective assistance claim on direct appeal." *Ortiz v. State*, 93 S.W.3d 79, 88–89 (Tex. Crim. App. 2002). Rarely will a reviewing court be provided the opportunity to make its determination on direct appeal with a record capable of providing an evaluation of the merits of ineffective assistance claims. *Thompson*, 9 S.W.3d at 813. "In the majority of instances, the record on direct appeal is simply undeveloped and cannot adequately reflect" the reasoning of trial counsel. *Id*. at 813–14. Only in the rare case "in which trial counsel's ineffectiveness is apparent from the record" may the appellate court "address and dispose of the claim on direct appeal." *Lopez*, 343 S.W.3d at 143.

If Smith fails either of the two *Strickland* requirements, we must overrule his claim of ineffective assistance of counsel. Prejudice is established when the appellant can show a reasonable probability the result of the proceeding would have been different if not for counsel's

22

deficient performance. *Strickland*, 466 U.S. at 694. This is "a probability sufficient to undermine confidence in the outcome." *Id*.

## C.      Application

In *Lampkin v. State*, No. 06-14-00024-CR, 2015 WL 4735664, at *27 (Tex. App.—Texarkana Aug. 11, 2015, no pet.), we recently discussed the difficulty of establishing *Strickland* prejudice during the sentencing phase in Texas. We noted that Texas' discretionary, non-capital sentencing scheme where punishment is decided by a jury, the secretive nature of jury deliberations, the absence of written findings, and the use of a general verdict form leave little information by which a defendant can demonstrate that he would have received a lesser sentence but for his trial counsel's deficient performance. *Id*. Yet, we also noted that Texas courts have found prejudice in such cases where the evidence establishes prejudice to a degree "beyond mere conjecture and speculation." *Id*. at *28. While we acknowledged that the standard appears somewhat vague, we observed that a few Texas courts have found prejudice in such cases. *Id*. Finally, we noted that those cases relied on certain factors in making that evaluation, and based on those cases, we identified a non-exclusive list of factors relied upon by Texas courts to determine whether *Strickland* prejudice exists.

> [I]n deciding whether a defendant has established *Strickland* prejudice during the punishment phase of non-capital cases as a result of deficient attorney performance of any kind, the following non-exclusive list of factors [is] relevant: (1) whether the defendant received a maximum sentence, (2) the disparity, if any, between the sentence imposed and the sentence(s) requested by the respective parties, (3) the nature of the offense charged and the strength of the evidence presented at the guilt/innocence phase of trial, (4) the egregiousness of counsel's error—essentially, the relationship between the amount of effort and resources necessary to have prevented the error as compared to the potential harm from that error—and (5) the defendant's criminal history.

23

*Id*. at \*30. Considering the evidence in the present case in light of those factors, we do not address whether Smith's trial counsel's failure to review the jury questionnaires prior to voir dire constituted deficient performance because we find that Smith was not prejudiced even if he could establish that his trial counsel provided deficient performance.

Smith received a life sentence for his sexual assault conviction, which was the maximum sentence available for that offense. The State requested a life sentence, and the defense did not argue for a particular sentence, but in response to cross-examination, Smith himself admitted that a person who had committed the crime he committed was deserving of a life sentence. Thus, although he received a maximum sentence for the sexual assault offense, it was not inconsistent with the parties' respective positions. Moreover, Smith only received a thirty-year sentence for his aggravated robbery conviction. As noted, Smith argues that the thirty-year sentence demonstrates that veniremember 35's presence on the jury resulted in a maximum sentence. Yet, it is more probable that the thirty-year sentence demonstrates dispassionate deliberation by the jury in distinguishing the more serious sexual assault conviction from the less serious aggravated robbery conviction. Accordingly, the first two factors weigh against a finding of prejudice.

The nature of the offense charged and the evidence presented, summarized above, was particularly heinous. The State's evidence of aggravating factors was also strong. Although Smith initially denied any responsibility for the assault and robbery and tried to place the blame on his friend Blake, the DNA evidence established his guilt, and Smith ultimately pled guilty to both charges. The State also demonstrated that Smith had attempted a similar blame-shifting strategy in a prior juvenile offense suggesting that the offenses in this case were planned.

24

This was a brutal and violent attack, capped with a robbery, where Smith somewhat bizarrely seemed to try to establish a kind of rapport with Higgins, complimenting her appearance and giving a slight hug or pat after the fact. There was significant evidence that the offenses were not only premeditated, but that Smith tried to shift blame to his friend. The jury heard evidence, including an audio/video recorded interview, of Smith's persistent denials of any responsibility. This evidence established that he gradually and frequently changed his account of events, including a sudden revelation or claim of having been molested as a child, as trial approached and evidence mounted against him. Smith himself said, before the jury, that a perpetrator of such an offense, including himself, deserved a life sentence; and that he could not be trusted to be free in society.

Moreover, Higgins provided graphic detail of the assault and robbery, and the SANE nurse, Bell, testified to the significant injuries Higgins received, including bruises on her face and neck, ligature marks on her wrists, "anal tearing, [and] excoriations to the inner labial folds, the butt crack area." Higgins also testified to the threats Smith made to her, pointing a gun to her head, and later to her back, and telling her he would shoot her. She also testified that she pled for her life. Finally, she testified to the significant trauma she suffered, and still suffers, as a result of the assault and robbery.

By contrast, scant mitigating evidence was presented. Although Smith was only nineteen at the time of this offense, he had already been adjudicated a juvenile delinquent and served probation. Moreover, the mitigating evidence that did exist could also have been characterized as aggravating. For example, Smith's use of the same blame-shifting tactic in this case that he used

in the prior juvenile burglary case could have led jurors to conclude that he is calculating and manipulative. Additionally, Smith's failure to disclose that he had been sexually abused until after the DNA results had implicated him suggests that he fabricated the alleged abuse to curry sympathy with the jury. Consequently, the nature of the case and the evidence presented strongly weigh against a finding of prejudice.

The record does not provide much detail regarding the egregiousness of an alleged error by trial counsel in reviewing the questionnaires. We are not told, for instance, who had possession of the questionnaires after they were completed and why counsel did not know of their existence prior to the *Batson* hearing. While it certainly would have been prudent to review the questionnaires, there seems to have been an agreement between the parties that neither side would review them after questioning the venire and prior to making their peremptory strikes. It is true that had counsel seen veniremember 35's questionnaire, he would have possessed a further justification for striking her; or perhaps he could have recalled her for further questioning and possibly challenged her for cause. But there is nothing in the record to convince us that this one juror significantly altered the jury's deliberations. It is more than conceivable that based on the evidence in this case, the jury still would have assessed a life sentence. Therefore, this factor is neutral.

Finally, Smith's criminal history reflects a prior juvenile adjudication for burglary of a building. While his criminal history is limited, he was only nineteen years old when he committed the offenses in this case. This factor is also neutral.

Accordingly, Smith has not shown by a preponderance of the evidence a reasonable probability that the outcome of his punishment trial would have been different but for counsel's alleged ineffectiveness. We could not find prejudice without engaging in conjecture or speculation. Therefore, we overrule Smith's seventh point of error.

We affirm the trial court's judgment and sentence.


Ralph K. Burgess
Justice

Date Submitted:     May 20, 2015
Date Decided:       September 23, 2015

Do Not Publish